UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   9/24/18

STEVEN FERDMAN,

        Plaintiff,

  - against –

CBS INTERACTIVE INC.

        Defendant.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 1317 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      In this action, Plaintiff Steven Ferdman sues Defendant CBS Interactive Inc. for
unlicensed use of his copyrighted photographs on its website.

      The parties have filed cross-motions for partial summary judgment concerning
infringement, willfulness, and Defendant's affirmative defenses of fair use, failure to state a
claim, and license. (Dkt. Nos. 24-27, 29-46). For the reasons set forth below, the parties'
motions will be granted in part and denied in part.

## BACKGROUND[1]

      Plaintiff Steven Ferdman is a professional photographer who licenses his
photographs to publishers for a fee. (Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 1)  His
photographs have appeared in Vogue, Variety, and other publications.  (Id. ¶ 2)

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it
has done so because the opposing party has either not disputed those facts or has not done so
with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)).  Where the
non-moving party disputes the moving party's characterization of cited evidence, and has
presented an evidentiary basis for doing so, the Court relies on the non-moving party's
characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)

Defendant CBS Interactive Inc. publishes GameSpot, an internet publication accessible at www.gamespot.com. (Id. ¶ 13; Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 20)[2] GameSpot "provides news and commentary about video games and entertainment of interest to video game players." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 20)

In September 2016, the movie Spider-Man: Homecoming was in production, and scenes of the movie were being filmed in Queens. (Id. ¶¶ 1-2) Plaintiff took 307 photographs of the movie's production from public locations, including photographs of actor Tom Holland. (Id. ¶ 3; Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 3)

Rex by Shutterstock is one of Plaintiff's agents for purposes of licensing his photographs, and Rex receives 50% of the license fee it generates in connection with the sale or license of photographs created by Plaintiff. (Id. ¶¶ 4-5) Between September 26 and September 28, 2016, Plaintiff uploaded to Rex – for purposes of licensing – the Spider-Man photographs he had taken. (Id. ¶ 6; Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 6) Prior to the filing of the instant

<hr>

(court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

[2] The parties dispute whether Plaintiff's Rule 56.1 Counterstatement should be considered. (Dkt. Nos. 45 & 46) Plaintiff states that "[d]ue to an unfortunate and inadvertent office error, Plaintiff did not file his [Rule 56.1 Counterstatement] at the time his Opposition brief was due." Plaintiff requests that the Court consider his Rule 56.1 Counterstatement even though it was filed approximately one month late. (Nov. 22, 2017 Pltf. Ltr. (Dkt. No. 45) at 1) Defendant states that "Plaintiff's suggestion that he merely failed to file this document borders on sanctionable, as this document not only was not filed it *never was served* and likely was not even drafted until the significance of Plaintiff's failure was made clear at a settlement conference just the other day." (Nov. 25, 2017 Def. Ltr. (Dkt. No. 46) at 1 (emphasis in original)) Defendant further notes that, in many instances, "Plaintiff's statement does not identify countervailing evidence, but only [provides] arguments without citation to any evidence of record." (Id. at 2) Moreover, Plaintiff does not contest the majority of Defendant's factual assertions. Given these circumstances, Plaintiff's Rule 56.1 Counterstatement is entitled to little weight, and its consideration by the Court will not unfairly prejudice Defendant.

2

action on February 21, 2017, Rex had sold 27 licenses concerning Plaintiff's Spider-Man photographs, generating license fees of approximately $292. (Id. ¶ 7)

On November 7, 2016, Plaintiff obtained a certificate of registration from the U.S. Copyright Office – VA 2-022-430 – for a group of works entitled "Group Registration of Published Photographs; Spiderman; All published 9/24/2016-9/30/2016; 307 Photographs." (Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 8; Ferdman Decl., Ex. B (Certificate of Registration) (Dkt. No. 26-3) at 2)[3] As discussed below, the parties dispute whether the photographs at issue in this case are included in this registration. (Id. ¶ 10)

On September 27, 2016, GameSpot published an article entitled "New Spider-Man: Homecoming Photo Shows Tom Holland Suited Up: Filming on the 2017 movie has moved from Atlanta to New York" (the "Holland Article"). (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 24; Makuch Decl., Ex. A (Holland Article) (Dkt. No. 33-1) at 2) The Holland Article reads as follows:

With Spider-Man: Homecoming now in production, images and videos from the set have steadily emerged. The newest shot comes from Spider-Man actor Tom Holland himself.

**Posted to his Instagram page**, the image celebrates the fact that shooting has shifted to Queens, which is Peter Parker's hometown. "First night in Queens and it feels like home already," Holland wrote. Here is the picture:

---

[3] The Court notes that only the odd pages of the Certificate are included in the declaration. (See id.)

3



Production moved to New York after time in Atlanta, where Homecoming
director Jon Watts (Cop Car) shot a silly video of Holland **breakdancing to Daft
Punk in his Spider-Man motion capture suit**. . . .

(Cmplt., Ex. B (Dkt. No. 1-2) at 9; Holland Article (Dkt. No. 33-1) at 2)[4]

As shown above, the Holland Article contains a copy of the photograph posted to

Holland's Instagram page. That photograph was taken by Plaintiff. (Pltf. R. 56.1 Counterstmt.

(Dkt. No. 45-1) ¶ 27; Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 15)[5]

---

[4] Bold lettering has been added to indicate that the text contains a hyperlink to another webpage.

[5] Plaintiff does not dispute Defendant's assertion that "[t]he Holland Article included a copy of
the photo that Holland posted to his Instagram page and commented that 'the image celebrates
the fact that shooting has shifted to Queens, which is [Spider-Man character] Peter Parker's
hometown.'" (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 27)

On September 29, 2016, GameSpot published an article entitled "Latest Spider-Man: Homecoming Images Showcase Action on New York's Streets" (the "Gallery Article"). (Id. ¶ 29; Auty Decl., Ex. A (Gallery Article) (Dkt. No. 34-1) at 2) In relevant part, the article states:

> The upcoming Marvel movie Spider-Man: Homecoming is currently filming in New York, and the steady stream of on-set images and videos continues. Following **a picture posted by star Tom Holland earlier this week (http://www.gamespot.com/articles/new-spider-man-homecoming-photo-shows-tom-holland-/1100-6443967/)**, a host of new imagery has landed via **Collider (http://collider.com/spider-man-homecoming/).** Check out the video below, with more in the gallery at the end of the story.
>
> [*Video.*]
>
> Production on Homecoming has moved to New York after time in Atlanta. . . .

(Gallery Article (Dkt. No. 34-1) at 2)

At the end of the Gallery Article is a series of images of Spider-Man, including photographs that GameSpot believed had been released by the movie studio or otherwise had been made available for use by the media. (Id. at 3; Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 33) GameSpot obtained all of these photographs from a Twitter account that GameSpot believed was circulating studio publicity shots. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 34) Seven of the photographs in the gallery had been taken by Plaintiff, however. (Id. ¶ 35)

The Complaint was filed on February 21, 2017, and alleges that Defendant "infringed Plaintiff's copyright in the [Spider-Man] Photographs by reproducing and publicly displaying the Photographs on [its] Website." (Cmplt. (Dkt. No. 1) ¶ 14) The Complaint further alleges that Defendant's infringement was willful. (Id. ¶ 16) The parties have filed cross-motions for partial summary judgment concerning infringement, willfulness and Defendant's affirmative defenses of fair use, failure to state a claim, and license. (Dkt. Nos. 24-27, 29-45)

5

## DISCUSSION

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, LLC, 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in

6

original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citation omitted)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment . . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citations omitted).

## II. INFRINGEMENT

Plaintiff has moved for summary judgment on his claim of copyright infringement. (Pltf. Br. (Dkt. No. 25) at 9-14)

### A. Legal Standard

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); see also Mint, Inc. v. Amad, 10 Civ. 9395 (SAS), 2011 WL 1792570, at *2 (S.D.N.Y. May 9, 2011) (same). With respect to the first element, "'[a] certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright.'" Mint, 2011 WL 1792570, at *2 (quoting Hamil Am. Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999))

### B. Plaintiff's Discovery Violation and its Consequences

Defendant argues that Plaintiff's motion for summary judgment on infringement should be denied, because he has not established as a matter of law that the photographs at issue were registered with the Copyright Office. (Def. Opp. (Dkt. No. 35) at 4-7)

7

Defendant contends that "plaintiff has provided a copy of a registration certificate . . . , but he has produced <u>no evidence</u> demonstrating that <u>any</u> of the photos at issue in this case actually were covered by that registration." (Def. Opp. (Dkt. No. 35) at 4-5 (emphasis in original)) Defendant further states that while

> [t]he registration certificate submitted by Mr. Ferdman lists 307 image numbers for photos covered by that registration[,] [n]one of the image numbers listed on the registration certificate matches the image numbers for the photos at issue. . . . [D]ocuments produced in discovery by Mr. Ferdman provide very different image numbers for the photos in suit and nowhere list the image numbers appearing on the registration.

(Id. at 5 (citations omitted))

Defendant further complains that, when deposed, "Mr. Ferdman was unable to confirm what photos actually got submitted to the Copyright Office or were covered by his registration." (Id. at 6) Finally, although Ferdman submitted a declaration at summary judgment attaching copies of photographs he represents were sent to the Copyright Office (Ferdman Decl., Exs. D-2 & -3 (Dkt. Nos. 26-6 & -7)), Defendant argues that Plaintiff is trying to "sneak into the record documents that <u>he never produced</u> in discovery. . . . These [documents] were *withheld* despite being requested in GameSpot's document requests and again during his deposition – when his failure to already produce them was discussed at length." (Id. at 6 n.1 (emphasis in original)) Defendant argues that it has been prejudiced by Plaintiff's failure to produce these materials during discovery – despite repeated requests – and that these documents should not be considered at summary judgment. (Id. (citing Lujan v. Cabana Mgmt., Inc., 284 F.R.D. 50, 70-71 (E.D.N.Y. 2012))

In response, Plaintiff argues that the certificate of registration is prima facie evidence of the validity of the copyright (Pltf. Reply. (Dkt. No. 44) at 4), and that Defendant has

8

not produced evidence to rebut the validity of this registration. (Id. at 5, 7-8) Plaintiff further

argues that

> Defendant mistakenly believes that it is Plaintiff who shoulders the burden (financial and otherwise) to obtain certified copies of deposits from the U.S. Copyright Office. However, as a matter of law, it is the Defendant's 'heavy burden' alone to prove invalidity of the . . . Registration.

(Id. at 7) Plaintiff also contends that Ferdman's deposition testimony

> that he no longer had possession of the hard copies of [the] Subject Photographs . . . does not negate his sworn affidavit that he caused copies of the same to be deposited with the U.S. Copyright Office. Given the volume and cost of keeping hard copies of photographs for a professional photographer, Ferdman doesn't keep hard copies of his works indefinitely. Having failed to gather hard evidence from the U.S. Copyright Office and having failed to show that the subject photographs are not deposited, Defendant offers nothing more than its own biased speculation as to Ferdman's credibility.

(Id. at 8)

The background as to Plantiff's alleged discovery violation is as follows: Fact

discovery in this case closed on August 11, 2017. (See Civil Case Management Plan and

Scheduling Order (Dkt. No. 14) at 1) On May 26, 2017 – early in the discovery process –

Defendant requested "[a]ll documents relating to registration of any copyright in the

Photographs, including but not limited to copies of any registrations, applications to register,

copies of the work that were submitted for registration to the Copyright Office, and any

communications with the Copyright Office relating to registration of the Photographs."

(Penchina Decl., Ex. A (Requests for Production) (Dkt. No. 37-1) at 8, 11) Plaintiff did not

produce copies of the works submitted for registration. (Penchina Decl., Ex. B (Plaintiff's

Production of Documents) (Dkt. No. 37-2); see id. Ex. C (Ferdman Dep.) (Dkt. No. 37-3) at 7-8

(defense counsel stating: "You were asked for the application with the jpegs. You provided the

application without the jpegs. Without the jpegs, there is nothing here that indicates – you could

list numbers all you want. That's meaningless."))

9

Instead of producing a copy of what he had submitted to the Copyright Office, Plaintiff produced a printout from Rex by Shutterstock of images he uploaded to that website. (Id.) For each photograph, the printout contains a small image of the photograph, a date between September 26, 2016 and September 27, 2016 – consistent with the dates Plaintiff states he uploaded the photographs to Rex (Def. R. 56.1 Counterstmt. (Dkt. No. 36) ¶ 6) – Tom Holland's name, and an image number. (See Plaintiff's Production of Documents (Dkt. No. 37-2)) As Defendant notes, these image numbers do not match the image numbers listed in the Certificate of Registration. (Def. Opp. (Dkt. No. 35) at 5-6) For example, while the photograph used in the Holland Article has an image number of "6023475e SVF" printed on the document Plaintiff produced (id. at 3), the same image attached to Ferdman's declaration and on the Certificate of Registration has a file name of "DSC_9261.jpg." (Ferdman Decl., Ex. D-3 (Dkt. No. 26-7) at 5; see also Certificate of Registration (Dkt. No. 26-3) at 3 (listing "DSC_9261.jpg" as the title of an image covered by the registration))

During Plaintiff's August 9, 2017 deposition, when defense counsel asked Plaintiff how he would know if a particular image was covered by the Certificate of Registration, Plaintiff responded that he would know by "[t]he Metadata, the file name. The only thing that gives you here is the file name. . . . Each [photograph] has a unique file name. I can go back and see which one corresponds to which." (Ferdman Dep. (Dkt. No. 37-3) at 4) However, when Plaintiff was questioned at the deposition as to whether he has "a copy of what was submitted to the copyright office in order to obtain this registration," Plaintiff testified, "I don't." (Id. at 6) When asked how he knew what was covered by the registration – given that he didn't have a copy of what was submitted to the Copyright Office – Plaintiff responded that "[t]his was the first set that I did submit, so I gave [the Copyright Office] all my photos to register for me." (Id.)

10

Defendant repeated its request for "a copy of what was submitted to the copyright office," and explained that "[w]ithout seeing what the copyright office has, we have no idea what's covered by this registration and neither do you." (Id. at 7) When Plaintiff's counsel stated that "I know what was submitted because I was the one who did it" (id.), Defense counsel stated that

> [t]hat's not evidence. What's evidence is what was submitted to the copyright office. If photos were omitted from it accidentally, they are not covered by this registration and we are entitled to see what was submitted and that was asked for and there was no objection to producing that, and we'd like to see it. . . . You were asked for the application with the jpegs. You provided the application without the jpegs. Without the jpegs, there is nothing here that indicates – you could list numbers all you want. That's meaningless. . . . I want what was submitted to the copyright office, whatever it was, a copy of that. . . . If you have a copy, we're entitled to it. If you don't have a copy, I can't make you create one and I don't want you to create anything new.

(Id. at 7-8)

There is no evidence that Plaintiff produced any documents in response to defense counsel's request. On October 6, 2017, however – in support of his summary judgment motion – Plaintiff submitted a declaration stating that the photographs attached as an exhibit to his declaration are "a copy of the Subject Photographs that was deposited [with the Copyright Office] along with the application." (Ferdman Decl. (Dkt. No. 26) ¶ 9) Although the declaration does not explain where these copies came from, each of the photographs is identified by a file number that matches a title included in the Certificate of Registration. (Compare Ferdman Decl., Exs. D-2 & D-3 (Dkt. Nos. 26-6 & -7), with Certificate of Registration (Dkt. No. 26-3), and Ferdman Decl., Ex. C (Public Record of Registration) (Dkt. No. 26-4))

Before determining whether Plaintiff's failure to produce these materials during discovery warrants a discovery sanction, the Court will address Plaintiff's argument that registration is prima facie evidence of the validity of a copyright, and that Defendant has not produced evidence rebutting the validity of the registration. (Pltf. Reply (Dkt. No. 44) at 4-5, 7)

11

This argument is not relevant, because Defendant is not challenging the validity of the copyright registration. Defendant is instead disputing whether the photographs that are the subject of this lawsuit are actually included in the registration. Accordingly, the cases Plaintiff cites as to Defendant's burden to rebut the validity of a copyright registration (Pltf. Reply (Dkt. No. 44) at 7) are not applicable. See Mantel v. Microsoft Corp., 16 Civ. 5277 (AJN), 2018 WL 1602863, at *5 (S.D.N.Y. Mar. 29, 2018) ("The Defendants do not seek to undermine the validity of the 059 Registration – it is not disputed that 25 of [Plaintiff's] photographs are protected by a presumptively valid copyright registration. Rather, what is disputed is whether [Plaintiff's] photograph of Yiru Sun is one of those 25 photographs.")

In determining whether a discovery sanction is appropriate, courts consider four factors: "'(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the [excluded evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance.'" Id. at *4 (quoting Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006)) (applying these factors at summary judgment and determining that preclusion was appropriate where plaintiff attempted to use documents not produced in discovery to demonstrate that certain photographs were included in a copyright registration); see also Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (applying four-factor test for preclusion at trial).

The Mantel court's application of the four-factor test is instructive here. In Mantel, plaintiff – a professional photographer – sued after his photograph appeared in a video featured on defendants' websites; defendants did not have a license to publish plaintiff's photograph. Mantel, 2018 WL 1602863 at *1. As here, the photograph at issue was part of a group registration of 25 photographs – the "059 Registration" – and defendants moved for

12

summary judgment on the basis that Plaintiff "cannot demonstrate using admissible evidence that he had a valid copyright." Id. at *3. At summary judgment, plaintiff offered two pieces of evidence to "prov[e] that his photograph [was] part of the 059 Registration: (1) his sworn declaration stating that he 'caused a copy of the Subject Photograph to be deposited with the U.S. Copyright Office as part of [his] application bearing service request #1-3653740711, dated June 16, 2016,' . . . and (2) a copy of the copyright registration application that [he] sent to the U.S. Copyright Office." Id. (internal citations omitted). The court concluded that

> [e]ven assuming that this evidence would be sufficient to survive a motion for summary judgment on the issue of possession of a valid copyright, it was not produced during discovery, and the Court concludes that it is appropriate in this case to prevent the Plaintiff from supplementing the factual record on this motion for summary judgment with information and material that was withheld during the course of discovery.

Id. at *4.

Turning to the four Patterson factors, the court found that

> [Plaintiff] has provided no justification for his failure to produce documents in his possession regarding the copyright registration except to state that Defendants also could have "obtain[ed] certified copies of deposits from the U.S. Copyright Office." However, Plaintiff represented that he had these documents in his possession, Defendants requested the documents early in the discovery process, and the Plaintiff told the Defendants that he would produce the documents to them. Defendants were entitled to rely on his representations and not seek their own certified copy of those same documents. In addition, the Plaintiff failed to produce any discovery during the months-long discovery process without seeking an extension of the deadline or even informing Defendants that other testimony or documents would be forthcoming. Indeed, the Plaintiff was put on clear notice at the post-discovery conference that late efforts to produce discovery would not be tolerated. Nevertheless, the Plaintiff's effort to rely on unproduced evidence came after that warning. As a result, although the Court recognizes that the excluded evidence is plainly important, it would be awarding gamesmanship and a failure to follow the rules if the Court allowed the evidence into the record.

Id. (internal citations omitted).

The court further concluded that defendants would be prejudiced if plaintiff was permitted to use at summary judgment materials that he had not produced in discovery:

Defendants filed for summary judgment specifically because the Plaintiff had never provided testimony or documentation proving that the photograph at issue was protected by a copyright. It would thus be highly prejudicial to Defendants to allow the Plaintiff to supplement the record with dispositive evidence after the motions for summary judgment have been fully briefed. Allowing the Plaintiff to put his testimony or his registration application into the record now would require discovery to be reopened because it would require Defendants to conduct further discovery, including potentially depositions, and to adopt a very different litigation strategy. Reopening discovery would thus delay this litigation and incur additional expenses by the parties that are difficult to quantify. Finally, although a trial date has not yet been set, and thus the fourth factor does not weigh heavily against the Plaintiff, the bell cannot be unrung with regard to the time and money devoted by the parties to summary judgment based on the evidentiary record as developed.

Id. (internal citations omitted).

The same principles addressed in Mantel support preclusion here. As to the first Patterson factor, Plaintiff has offered no explanation for his failure to produce copyright application-related materials during discovery. Plaintiff's argument that Defendant could have obtained copies from the Copyright Office does not address why Plaintiff did not produce the requested materials during discovery. Defendant asked for all documents related to the copyright application both in its request for production and at Plaintiff's deposition, and Plaintiff represented that he did not have a copy of what was submitted to the Copyright Office. The Court concludes that this factor favors preclusion.

As to the second Patterson factor – the importance of the evidence at issue – the evidence is admittedly critical to this case. However, "the mere fact that 'the evidence may be important is not sufficient to avoid preclusion where no explanation has been given for the delay.'" Simon v. City of New York, 14 Civ. 8391 (JMF), 2017 WL 57860, at *6 (S.D.N.Y. Jan. 5, 2017) (quoting Lebada v. New York City Dep't of Educ., 14 Civ. 758 (LAK) (GWG), 2016 WL 626059, at *7 (S.D.N.Y. Feb. 8, 2016), report and recommendation adopted, 2016 WL 8453417 (S.D.N.Y. May 16, 2016)). "[T]o hold otherwise 'would give parties the perverse

incentive to spring especially large and surprising disclosures on their adversaries on the eve of
trial – an extreme version of the 'sandbagging' that Rule 26 attempts to avoid.'" Id. (quoting
Agence France Presse v. Morel, 293 F.R.D. 682, 687 (S.D.N.Y. 2013)). Given that Plaintiff has
offered no explanation for his failure to produce the documents at issue during discovery, the
Court concludes that the importance of the evidence "is not sufficient to avoid preclusion." (Id.)

The last two factors – prejudice to Defendant and the possibility of a continuance
– also weigh in favor of preclusion. Were the Court to consider the evidence at issue at summary
judgment, Defendant would be unfairly prejudiced, because Defendant's opposition to Plaintiff's
motion for summary judgment as to infringement is premised on the lack of evidence linking the
photographs at issue to the certificate of registration. See Mantel, 2018 WL 1602863, at *4 ("It
would thus be highly prejudicial to Defendants to allow the Plaintiff to supplement the record
with dispositive evidence after the motions for summary judgment have been fully briefed.").

And as the Mantel court stated,

[a]llowing the Plaintiff to put his . . . registration application into the record now
would require discovery to be reopened because it would require Defendants to
conduct further discovery . . . and to adopt a very different litigation strategy.
Reopening discovery would thus delay this litigation and incur additional
expenses by the parties that are difficult to quantify. Finally, although a trial date
has not yet been set, and thus the fourth factor does not weigh heavily against the
Plaintiff, the bell cannot be unrung with regard to the time and money devoted by
the parties to summary judgment based on the evidentiary record as developed.
Because a continuance cannot alleviate the prejudice Defendants would
experience if discovery were reopened at this late stage, the Court concludes that
the fourth factor does weigh in Defendants' favor.

Id.; see also Lebada v. N.Y.C. Dep't of Educ., 14 Civ. 758 (LAK) (GWG), 2016 WL 626059, at
*7 (S.D.N.Y. Feb. 8, 2016) ("[T]he fact that discovery closed many months ago 'also weighs
strongly against the possibility of a continuance.'" (quoting Spotnana, Inc. v. Am. Talent

15

Agency, Inc., 9 Civ. 3698 (LAP), 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010))), report and recommendation adopted, 2016 WL 8453417 (S.D.N.Y. May 16, 2016).

The Court concludes that preclusion is warranted. With these documents excluded, there is a genuine issue of material fact as to whether the photographs that are the subject of Plaintiff's infringement claim are included in the copyright registration. Although Plaintiff testified – in a conclusory fashion – that he "gave [the Copyright Office] all my photos to register for me" (Ferdman Dep. (Dkt. No. 37-3) at 6), Plaintiff also testified that he did not have a copy of what was submitted to the Copyright Office. (Id.) Given that Plaintiff submitted 307 photographs at this time, and that none of the designations on the photographs produced by Plaintiff during discovery match the designations on the Certificate of Registration, this Court cannot conclude as a matter of law that the photographs that are the subject of this action were included in the registration. In the absence of "hard evidence" linking the photographs at issue to the certificate of registration, summary judgment is inappropriate. See Mantel, 2018 WL 1602863, at *3 ("[T]he Court concludes that the [p]laintiff cannot point to any 'hard evidence,' [D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998),] that the photograph [plaintiff] took of Yiru Sun was one of the photographs registered with the Copyright Office as part of the 059 Registration.").

Accordingly, Plaintiff's motion for summary judgment on the issue of infringement will be denied.

## III.    FAIR USE

The parties have cross-moved for summary judgment on Defendant's fair use defense. (Pltf. Br. (Dkt. No. 25) at 14 (moving against a fair use defense as to all the photographs); Def. Br. (Dkt. No. 30) at 11 (moving for a fair use defense only as to the photograph used in the Holland Article))

16

## A. Legal Standard

Under the Copyright Act, "the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. The Copyright Act provides that four factors should be considered in determining whether the use of a work is fair use:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Id. As these factors indicate, "the determination of fair use is an open-ended and context-sensitive inquiry." Blanch v. Koons, 467 F.3d 244, 251 (2d Cir. 2006).

"Fair use is a mixed question of law and fact." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560 (1985). "The fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area; however, it does not protect the copyright holder from summary disposition of her claims where there are no material factual disputes." Wright v. Warner Books, Inc., 953 F.2d 731, 735 (2d Cir. 1991) As the Supreme Court has explained, the four factors are not treated "in isolation, one from another"; rather, "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994).

17

## B.    Analysis

### 1.    Purpose and Character of the Use

The first fair use factor focuses on "whether the new work merely 'supersede[s] the objects' of the original creation or instead adds something new." Id. at 579 (quoting Folsom v. Marsh, 9 F. Cas. 342, 348 (No. 4,901) (C.C.D. Mass. 1841)) (internal citation omitted). "[T]he primary inquiry is whether the use 'communicates something new and different from the original or [otherwise] expands its utility,' that is, whether the use is 'transformative.'" Fox News Network, LLC v. Tveyes, Inc., 883 F.3d 169, 176 (2d Cir. 2018) (quoting Authors Guild v. Google, Inc., 804 F.3d 202, 214 (2d Cir. 2015)). "'Although . . . transformative use is not absolutely necessary for a finding of fair use, . . . [transformative] works . . . lie at the heart of the fair use doctrine . . . .'" Id. (quoting Campbell, 510 U.S. at 579). Indeed, "the more transformative the work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." Campbell, 510 U.S. at 579.

Although transformative use is the "primary inquiry" under this factor, Fox News Network, 883 F.3d at 176, courts also consider whether the use was for a commercial purpose and whether the use was in bad faith. These factors receive less weight than whether the use was transformative, however. As to commercial use, commercialism weighs against a finding of fair use. Even so, "the relative importance of this factor is determined on a sliding scale: the more transformative the work, the less important the commercial purpose," N. Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605, 618 (S.D.N.Y. 2015), and it is not appropriate to deny a fair use defense based simply on the fact that the use was commercial. NXIVM Corp. v. Ross Inst., 364 F.3d 471, 477 (2d Cir. 2004) (noting that Supreme Court has rejected notion that commercial nature of a use is dispositive). As to bad faith, "while the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis." Id. at 479 n.2;

18

see id. at 479 ("[W]hile the subfactor pertaining to defendants' good or bad faith must be weighed, and while it was error for the district court not to have fully and explicitly considered it, we find that even if the bad faith subfactor weighs in plaintiffs' favor, the first factor still favors defendants in light of the transformative nature of the secondary use."); see also 4 NIMMER ON COPYRIGHT § 13.05[A][1][d] ("One frequent factor recognized by courts relevant to the 'character' of the use is the propriety of the defendant's conduct.").

### a. Whether the Use Was Transformative

Defendant argues that the use of the photograph in the Holland Article (the "Holland Photograph") was transformative: "[t]he [Holland] Article reported and commented on Tom Holland's Instagram post of the photo, and discussed its significance to him and how he himself described it." (Def. Br. (Dkt. No. 30) at 13) Further, "the Photo was presented as a historic artifact – its significance was as the item which Tom Holland himself had shared, not what it incidentally depicted." (Id.) Given this transformative use, Defendant argues that its "status as a for-profit entity does not lessen the weight of the first factor in its favor." (Id.) As to the photographs in the Gallery Article (the "Gallery Photographs"), Defendant argues that these images were used "for news reporting purposes." (Def. Opp. (Dkt. No. 35) at 8)

Plaintiff contends that the use of the photographs was not transformative: "the Subject Photographs were used by Defendant in the exact same way and in the same context as it was used by legitimate, licensed publications. Defendant has simply published an article using the Subject Photographs in the same manner that was published by competitors in the cultural and entertainment marketplace. . . . Defendant merely illustrated its article at the expense of the Plaintiff." (Pltf. Opp. (Dkt. No. 43) at 12 (internal citation omitted)) Plaintiff further argues that "there are no alterations of the Subject Photographs['] colors, the background against which the subjects are portrayed, the medium, or the size of the subject matter depicted." (Id. at 13) While

19

Plaintiff acknowledges that the articles may have some news value, "'[n]ewsworthiness itself does not lead to transformation.'" (Id. at 14 (quoting Monge v. Maya Magazines, Inc., 688 F.3d 1164, 1176 (9th Cir. 2012)))

Plaintiff also argues that Defendant used the photographs "for a commercial rather than a nonprofit educational purpose," and that this use "weighs against a finding of fair use." (Id. at 15) There is, of course, "no dispute that Defendant is a for-profit entity which disseminates content on its website" (id. at 16), and "commercial advertisements appear alongside the Subject Photographs on Defendant's website." (Id.)

Finally, Plaintiff argues that Defendant's use was in bad faith: "Defendant's use of the Subject Photographs omits the authorship credit which appears next to the images as they appear on Rex by Shutterstock. The omission of Ferdman's name besides his photographs demonstrates Defendant's bad faith (or the absence of good faith and fair dealing) in its use of Ferdman's photographs." (Id. at 17 (internal citation omitted))

i. **Gallery Photographs**

The Court concludes that Defendant's use of the Gallery Photographs was not transformative. Although "news reporting" is a use described in Section 107 and "'there is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in § 107,'" NXIVM Corp. v. Ross Inst., 364 F.3d 471, 477 (2d Cir. 2004) (quoting Wright v. Warner Books, Inc., 953 F.2d 731, 736 (2d Cir. 1991)), "'use of copyrighted material that "merely repackages or republishes the original" is unlikely to be deemed a fair use.'" Fox News Network, 883 F.3d at 177 (quoting Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 108 (2d Cir. 1998)).

Here, the point of the Gallery Article is simply that the photographs exist: the Gallery Article only reports on the fact that the "steady stream of on-set images and videos continues," and provides a gallery of the images at the end of the article. (Gallery Article (Dkt. No. 34-1) at 2-3) The Article's commentary is not new information or insight that amounts to a transformative use. Were this purpose sufficient to invoke a presumption of fair use, nearly every use of a photograph in a news article could be considered "transformative." See Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 557 (1985) (where magazine published quotations taken from a purloined copy of an unpublished manuscript of Gerald Ford's autobiography, Supreme Court held fair use defense did not apply: "The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the book.").

Two recent cases illustrate these principles. In BWP Media USA, Inc. v. Gossip Cop Media, Inc., 196 F. Supp. 3d 395 (S.D.N.Y. 2016), defendant operated a "for-profit website that presents celebrity gossip news and opines on the veracity of celebrity news stories published by unaffiliated third-party outlets," and plaintiff "own[ed] the rights to a collection of photographs and videos of celebrities that it license[d] to various print and online publications." Id. at 398. Defendant posted "screen grabs" from third-party gossip websites of three images of the actress and actor Mila Kunis and Ashton Kutcher, the actor Robert Pattinson, and the model Liberty Ross to its website. Id. at 398-99. Defendant added to each image "an assessment of whether the story that accompanied the photo on the third-party website was 'real' or 'rumor,' as displayed on a 'real-to-rumor scale' posted alongside the image." Id. at 399.

After a bench trial, the court rejected defendant's fair use defense. As to the first two images, the court held that "[n]owhere in its stories accompanying the Kunis/Kutcher or

21

Pattinson Images does Defendant comment or report on the images in question, nor does it critique the source websites' use of those photos." Id. at 404. Although "[t]he 'new expression, meaning, or message' purportedly imbued by Defendant was a 'debunking' of each source-website's presentation of a given image[,] . . . nothing in Defendant's articles suggests that the images were misrepresented. A viewer could leave Defendant's website believing that the third-party sites reported false stories, but without any idea that the images were in any way relevant to the deception." Id. at 405 (emphasis in original). As to the Ross photograph, the court noted that it had "found no case . . . in which the use of an image solely to present the content of that image, in a commercial capacity, was found to be fair." Id. at 407. While defendant argued that the "picture is the story," the court found that "Defendant confuses the situation in which the photograph is the story . . . , and the scenario present here, in which the contents of the photograph are of some public interest. . . . Here . . . , the fact of the photograph is not of public interest; rather, it is the photograph's contents that are newsworthy." Id. at 406 n.6.

Similarly in Barcroft Media, Ltd. v. Coed Media Grp., LLC, 297 F. Supp. 3d 339 (S.D.N.Y. 2017), plaintiffs were "the purveyors of entertainment-related photojournalism and owners of certain copyrighted celebrity and human interest photographs," and defendant operated "celebrity gossip and entertainment websites [and] displayed several of Plaintiffs' photographs . . . on its websites without paying licensing fees or otherwise getting authorization." Id. at 346. After a bench trial, the court rejected defendant's fair use defense:

Display of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story about that work. See 17 U.S.C. § 107. For instance, a news report about a video that has gone viral on the Internet might fairly display a screenshot or clip from that video to illustrate what all the fuss is about. See, e.g., Konangataa v. Am. Broadcastingcompanies, Inc., No. 16-CV-7382 (LAK), 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017). Similarly, a depiction of a controversial photograph might fairly accompany a work of commentary or criticism about the artistic merit or

22

appropriateness of the photograph. See, e.g., Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 25 (1st Cir. 2000). In each such case, the copyrighted work is itself the subject of the story, transforming the function of the work in the new context.

Id. at 352. In Barcroft Media, however, the

> use of the Images had no transformative effect because it displayed the Images in the same manner and for the same purpose as they were originally intended to be used. Paparazzi photographs – the bulk of the Images – are designed to document the comings and goings of celebrities, illustrate their fashion and lifestyle choices, and accompany gossip and news articles about their lives. . . . The purposes for which [defendant] used the Images – to serve as banner images and thumbnails for "Daily Dumps" of celebrity news . . . ; to accompany articles about celebrity gossip and human interest stories . . . ; and to be included in roundups of celebrity fashion trends . . . – are all consistent with the original intent behind taking and copyrighting the Images. Thus, [defendant's] use was not transformative.

Id. at 351-52 (internal citations omitted).

Moreover, as in BWP Media, defendant's articles "did not comment on, criticize, or report news about the Images themselves; instead, they used the Images as illustrative aids because they depicted the subjects described in its articles. [Defendant]'s argument, if accepted, would eliminate copyright protection any time a copyrighted photograph was used in conjunction with a news story about the subject of that photograph. That is plainly not the law." Id. (emphasis in original).

As in BWP Media and Barcroft Media, the Gallery Article did not provide commentary about the photographs used other than the fact they existed: the Gallery Article merely reported that "[t]he upcoming Marvel Movie Spider-Man: Homecoming is currently filming in New York, and the steady stream of on-set images and videos continues." (Gallery Article (Dkt. No. 34-1) at 2) In other words, the Gallery Article involves "the use of an image solely to present the content of that image." BWP Media, 196 F. Supp. 3d at 407. Such a use is not transformative. See Monge v. Maya Magazines, Inc., 688 F.3d 1164, 1176 (9th Cir. 2012)

23

(gossip magazine published stolen photographs of a celebrity couple's wedding and provided commentary on the photographs; district court granted defendant summary judgment on fair use grounds; Ninth Circuit reversed, holding that plaintiffs were entitled to summary judgment on defendant's fair use defense, because defendant's use – "wholesale copying sprinkled with written commentary – was at best minimally transformative").

The Court concludes that Defendant's use of Plaintiff's photographs in the Gallery Article was not transformative.

## ii. Holland Photograph

The Holland Article – in contrast to the Gallery Article and the articles at issue in the cases discussed above – provides commentary on the Holland Photograph by presenting Holland's alleged take on the Holland Photograph: "**Posted to his Instagram page**, the image celebrates the fact that shooting has shifted to Queens, which is Peter Parker's hometown. 'First night in Queens and it feels like home already,' Holland wrote. Here is the picture." (Holland Article (Dkt. No. 33-1) at 2) Accordingly, the Holland Photograph "was the story," due to Holland's posting of the photograph on his Instagram account. Defendant injected some "new meaning or message" into the photograph by reporting that the actor himself had posted the photograph and had provided commentary on it. This "transformation of the work[] into news," Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 23 (1st Cir. 2000) provides some support for a finding of fair use.

Nunez is instructive here. In that case, Nunez – a professional photographer – took photographs of Joyce Giraud – the 1997 Miss Puerto Rico Universe – for use in her modeling portfolio. Id. at 21. Nunez then distributed the photographs to members of the Puerto Rico modeling community, and a controversy ensued about whether some of the photographs

24

were appropriate for a Miss Puerto Rico Universe. Id. A local television station displayed the photographs and conducted interviews about whether they were "pornographic," and Giraud was interviewed about her "fitness to retain the Miss Universe Puerto Rico crown." Id. Defendant El Vocero – a local newspaper – obtained several of the photographs "through various means," and published three of the photographs along with several articles about the controversy. Id. Nunez sued for copyright infringement, but the district court granted defendant summary judgment on fair use grounds, and the First Circuit affirmed.

The First Circuit held that the use of the photographs had an "informative" function: "[El Vocero] reprinted the pictures not just to entice the buying public, but to place its news articles in context; as the district court pointed out, 'the pictures were the story.' It would have been much more difficult to explain the controversy without reproducing the photographs. And although such an explanatory need does not always result in a fair use finding, it weighs in the favor of appellee." Id. at 22 (citing Iowa State Univ. Research Found., Inc. v. Am. Broad. Companies, Inc., 621 F.2d 57, 60 (2d Cir. 1980)). While noting that the newspaper's "use of the photographs was [not] necessarily fair merely because the photographs were used for news purposes," the First Circuit pointed out that "El Vocero did not manufacture newsworthiness, as it sought not to 'scoop' [Nunez] by publishing his photograph, but merely to provide news reporting to a hungry public. And the fact that the story is admittedly on the tawdry side of the news ledger does not make it any less of a fair use." Id. at 22-23 (citing Harper & Row, 471 U.S. at 561 ("[C]ourts should be chary of deciding what is and what is not news." (internal quotation omitted))).

The First Circuit went on to state that

by using the photographs in conjunction with editorial commentary, El Vocero did not merely "supersede[ ] the objects of the original creation[s]," but instead

25

used the works for "a further purpose," giving them a new "meaning, or message." Campbell, [510 U.S. at 57] .... It is this transformation of the works into news – and not the mere newsworthiness of the works themselves – that weighs in favor of fair use under the first factor of § 107.

Id. at 23 (citations omitted).

Here, as in Nunez, the Holland Photograph became a part of the story that Defendant was reporting. Unlike in the Gallery Article, Defendant is not merely reporting that the photographs exist; rather, Defendant is reporting that the actor himself posted the photograph and provided commentary concerning the photograph. As in Nunez, Defendant "did not manufacture newsworthiness, as it sought not to 'scoop' [Plaintiff] by publishing his photograph, but merely to provide news reporting to a hungry public." Id. at 22. And although some may regard Holland's posting of the Holland Photograph to his Instagram page as not as newsworthy as the photographs in Nunez, "'[c]ourts should be chary of deciding what is and what is not news.'" Harper & Row, 471 U.S. at 561 (quoting Harper & Row Publishers, Inc. v. Nation Enters., 723 F.2d 195, 215 (2d Cir. 1983) (Meskill, J., dissenting)).

While the Court concludes that Defendant's use of the Holland Photograph is somewhat transformative, it is not so transformative as to entitle Defendant to a fair use defense as a matter of law. First, Defendant does not argue that there are any relevant visual differences between Plaintiff's photograph and the Holland Photograph in the Holland Article. Second, although the Holland Article comments on Holland's posting of the photograph, as in the Gallery Article, it also reports on the fact that "[w]ith Spider-Man: Homecoming now in production, images and videos from the set have steadily emerged." (Holland Article (Dkt. No. 33-1) at 2); see also Gallery Article (Dkt. No. 34-1) at 2 ("The upcoming Marvel Movie Spider-Man: Homecoming is currently filming in New York, and the steady stream of on-set images and videos continues.")) As discussed above, the use of a photograph to announce its existence is not

transformative. Where – as here – reasonable jurors could disagree about whether – or the extent to which – a use is transformative, it is appropriate to deny summary judgment on a fair use defense.

In N. Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605 (S.D.N.Y. 2015), for example, Jeanine Pirro and Fox News Network were sued for copyright infringement based on their use of plaintiff's photograph of three firefighters raising the American flag at the ruins of the World Trade Center on September 11, 2001. Defendants juxtaposed plaintiff's copyrighted image with the World War II image of four U.S. Marines raising the American flag on Iwo Jima, and added the phrase "#neverforget." Id. at 609-11. The district court denied defendants summary judgment on their fair use defense, despite acknowledging the differences between plaintiff's photograph and the image used: "Defendants did not simply copy the work wholesale. The image used by Defendants was different from the Work in five distinct ways. Fox News used a (1) cropped, (2) lower-resolution version of the Work, (3) which was juxtaposed with Raising the Flag on Iwo Jima and (4) in a smaller scale than the Work, and (5) added the phrase '#neverforget.'" Id. at 615. The court nonetheless decided that it could not

conclude as a matter of law that the Combined Image transformed the Work sufficiently to merit protection as fair use. As Plaintiff asserts – accurately in the Court's view – the alterations to the Work are 'barely discernable' unless the viewer is specifically prompted to look for them. . . . Thus, a casual observer may believe that he is simply viewing the Work with only the hashtag added. Second Circuit authority suggests that more is required to 'transform' an image.

Id. The court ruled that "[m]aterial questions of fact exist concerning the purpose of the Combined Image's use, precluding a determination of the first statutory factor." Id. at 623.

Similarly, in Sarl Louis Feraud Int'l v. Viewfinder Inc., 627 F. Supp. 2d 123 (S.D.N.Y. 2008), plaintiffs designed and marketed high-fashion clothing, and defendant operated a website that contained photographs of the current season's fashions and photographs of past

collections, including photographs of plaintiff's designs. Id. at 125. The court held that although defendant left the "'character of the original garments unchanged,' a reasonable factfinder could find its secondary use highly transformative," and that summary judgment was therefore inappropriate. Id. at 129. "While courts have declined to find a transformative use when the defendant has 'done no more than find a new way to exploit the creative virtues of the original work,' . . . courts have found a secondary use to be transformative when it is 'plainly different from the original purpose for which [the copyrighted work was] created' – even where a secondary user has made an exact replication of a copyrighted image." Id. at 128-29 (citations omitted); see also Byrne v. British Broad. Corp., 132 F. Supp. 2d 229, 234 (S.D.N.Y. 2001) (where radio program's stated purpose was to "explore how the Irish-American media was reacting" to a criminal investigation and arrest of four Irish nationals on charges of gun running and radio program used a song – "Fenians" – in the broadcast, district court held that "a reasonable jury could find, on the record as it exists so far, that recording the Song [and using it in a news program] was wholly unnecessary to reporting on 'how the Irish-American media was reacting' to the FBI investigation," and that "the purpose and character of the use is a disputed issue of fact").

Here, as in North Jersey Media Group and Sarl Louis Feraud, reasonable jurors could disagree about whether – or the extent to which – Defendant's use of the Holland Photograph was transformative. On one hand, a jury could give weight to the importance of reporting on the fact that Holland posted the photograph himself. On the other hand, a jury could be persuaded by the argument that – like the Gallery Photographs – the Holland Article used the Holland Photograph "solely to present the content of that image[] in a commercial capacity." BWP Media, 196 F. Supp. 3d at 407.

28

In sum, the Court concludes that Defendant's use of the Holland Photograph may have had some transformative purpose, and that the issue cannot be resolved as a matter of law.

### b. Commercial Use

The Copyright Act instructs that in considering the first fair use factor – "the purpose and character of the use" – courts should take into account "whether such use is of a commercial nature." 17 U.S.C. § 107(1). "The fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use." Harper & Row, 471 U.S. at 562. Even so, "[t]he Supreme Court in Campbell rejected the notion that the commercial nature of the use could by itself be a dispositive consideration." NXIVM Corp., 364 F.3d at 477; see Campbell, 510 U.S. at 584 ("If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities 'are generally conducted for profit in this country.'" (quoting Harper & Row, 471 U.S. at 592)).

In short, although Defendant's for-profit status weighs against a finding of fair use, this factor is not dispositive here.

### c. Bad Faith

As discussed above, whether a defendant's use was in bad faith is generally considered under the first fair use factor. NXIVM Corp., 364 F.3d at 479 n.2 ("[W]hile the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis."). Here, Plaintiff contends that Defendant's uses were in bad faith, because "the Subject Photographs omit the authorship credit which appears next to the images as they appear on Rex by Shutterstock. The omission of Ferdman's name besides his photographs demonstrates Defendant's bad faith (or the absence of good faith and fair dealing) in its use of Ferdman's

29

photographs." (Pltf. Opp. (Dkt. No. 43) at 17 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 43) ¶¶ 6, 7, 15, 16); Rogers v. Koons, 960 F.2d 301, 309 (2d Cir. 1992) ("tearing the copyright mark off of" a work suggests bad faith)))

Plaintiff has offered no evidence that Defendant obtained the images in question from Rex by Shutterstock, however, or that it removed the authorship credit itself. To the contrary – as to the Gallery Photographs – Plaintiff admits that Defendant "obtained the photos . . . from a Twitter account believed by GameSpot to be circulating studio publicity shots." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 34; see Penchina Decl., Ex. 3 (Haywald Dep.) (Dkt. No. 32-3) at 14) Plaintiff also does not dispute that the Holland Article "included a copy of the photo that Holland posted to his Instagram page." (Id. ¶ 27) Accordingly, Plaintiff has not made a showing of bad faith.

### d. Conclusion as to the First Fair Use Factor

After balancing these considerations, the Court concludes that the first fair use factor cuts against a finding of fair use for the Gallery Photographs. As to the Holland Photograph, the first factor is neutral. There is a plausible transformative use; there is no evidence of bad faith; but Defendant is a commercial entity.

### 2. Nature of the Work

Under the second fair use factor, a court considers whether the work at issue was previously published and whether the work was informational or creative. See Byrne v. British Broad. Corp., 132 F. Supp. 2d 229, 235 (S.D.N.Y. 2001) ("Previously published works . . . qualify for 'far less protection' against fair use."); Mattel Inc. v. Walking Mountain Prods., 353 F.3d 792, 803 (9th Cir. 2003) ("creative works are 'closer to the core of intended copyright protection' than informational and functional works."). As the Second Circuit has recently

30

stated, however, "[t]his factor 'has rarely played a significant role in the determination of a fair use dispute.'" Fox News Network, 883 F.3d at 178 (quoting Authors Guild, 804 F.3d at 220).

Defendant argues that the nature of the Holland Photograph and the Gallery Photographs favor fair use. The Holland Photograph "is a factual depiction of events taking place in public. . . . [Plaintiff] simply photographed other people's activities as a news event occurring on the streets of Queens." (Def. Br. (Dkt. No. 30) at 14) Defendant further argues that the Holland Photograph "was published by [Plaintiff] – both on his own Instagram page and by his provision of the Photo to Rex Shutterstock." (Id. at 15)

Plaintiff argues that "although [his] photographs were created for purposes of illustrating the making of the [Spider-Man] movie, the Subject Photographs are more creative than factual because capturing these moments involved many aesthetic decisions, including the staging of the subjects, selection of lighting and the orientation of the image against a specific background." (Pltf. Opp. (Dkt. No. 43) at 18 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 27) ¶¶ 4-5))

As to Plaintiff's creativity argument, it is undisputed that Plaintiff took his photographs from a spot accessible to the general public, and that he was not given special access to the movie set. (Ferdman Dep. (Dkt. No. 32-1) at 17-18) The fact that Plaintiff was photographing the events around him as they occurred supports a finding of fair use. See N. Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605, 620 (S.D.N.Y. 2015) ("The Court finds that the second factor favors a finding of fair use. There can be no dispute that the Work is a non-fictional rendering of an event of utmost historical importance, which Franklin created during the course of his duties as a news photographer. Franklin did not create the scene or stage his subjects – to the contrary, he plainly acknowledged that the photograph 'just happened.' While there can be no dispute that Franklin exhibited great artistry in carrying out his task – for which

31

he has been rightfully recognized and rewarded – there can also be no dispute that the Work is a quintessential example of photojournalism."); see also Katz v. Google Inc., 802 F.3d 1178, 1183 (11th Cir. 2015) ("The Photo, however, is merely a candid shot in a public setting, and there is no evidence in the record that Magriso, the photographer, attempted to convey ideas, emotions, or in any way influence Katz's pose, expression, or clothing.")

Plaintiff likewise does not dispute that the photographs at issue had been published at the time Defendant published its articles. (Pltf. Opp. (Dkt. No. 43) at 18 n.11) As such, the second factor supports a finding of fair use.

### 3.    The Amount and Substantiality of the Portion Used

Under the third fair use factor, "[t]he relevant consideration is the amount of copyrighted material made available to the public rather than the amount of material used by the copier." Fox News Network, 883 F.3d at 178 (citing Authors Guild, 804 F.3d at 222) (emphasis in original).

Defendant argues that, in considering the amount of Plaintiff's work it used, "the underlying work that should be considered is not the single [Holland Photograph], but Mr. Ferdman's collection of his 307 Spider-Man photos. This is because he published all 307 as a unit by providing them all to Rex Shutterstock to offer for licensing to the public. . . . Thus, GameSpot's use of the single [Holland Photograph] in the [Holland] Article used only a tiny portion of the copyrighted work as a whole – just 1/307th of it." (Def. Br. (Dkt. No. 30) at 16)

Defendant's argument is misplaced. As the title of the registration indicates, it covers a group of published photographs. (Certificate of Registration (Dkt. No. 26-3) at 2) The applicable regulation covering group registration – 37 C.F.R. § 202.4 ("Group registration") – makes clear that each individual photograph is considered a "work." See § 202.4(a) ("This section prescribes conditions for issuing a registration for a group of related works . . . ."

32

(emphasis added)); § 202.4(i) ("[T]he Register of Copyrights has determined that a group of published photographs may be registered in Class VA with one application, the required deposit, and the filing fee required by § 201.3(c) of this chapter, if the following conditions are met . . . All the works in the group must be photographs . . . ." (emphasis added)). Group registration does not alter the status of each photograph as an individual work – rather, it is a matter of administrative convenience. See 17 U.S.C. § 408(c)(1) ("The Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration, and the nature of the copies or phonorecords to be deposited in the various classes specified. The regulations may require or permit, for particular classes, the deposit of identifying material instead of copies or phonorecords, the deposit of only one copy or phonorecord where two would normally be required, or a single registration for a group of related works. This administrative classification of works has no significance with respect to the subject matter of copyright or the exclusive rights provided by this title.")

Here, Defendant used each work – an individual photograph – in its entirety. Even so, "this factor 'weighs less when considering a photograph – where all or most of the work often must be used in order to preserve any meaning at all – than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value.'" N. Jersey Media Grp. Inc., 74 F. Supp. 3d at 621 (quoting Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 188 (D. Mass. 2007)). The Holland Article reported on Holland's posting of the image on Instagram, and the Gallery Article reported on the fact that images of the movie set were being released. Given these purposes, this factor is neutral – "'no more [of the works] [were] taken than necessary.'" Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 110 (2d Cir. 1998) (quoting Campbell, 510 U.S. at 589); see N. Jersey Media Grp., 74 F. Supp. 3d at 621 ("Given the express

purpose of commemorating the events of 9/11, it is not clear that Fox News' use of any less of the Work would have ensured its audience's recognition of the iconic photograph.").

### 4. The Effect of the Use Upon the Market for or Value of the Original

The fourth factor "is 'undoubtedly the single most important element of fair use,'" Fox News Network, 883 F.3d at 179 (quoting Harper & Row, 471 U.S. at 566), and focuses on "'whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original.'" Id. (quoting Authors Guild, 804 F.3d at 223). This factor requires consideration of "'not only the . . . market harm caused by the particular actions of the alleged infringer,' but also the market harm that would result from 'unrestricted and widespread conduct of the [same] sort.'" Id. (quoting Campbell, 510 U.S. at 590 (internal quotation marks and alteration omitted)).

As to the Holland Photograph, Defendant argues that the "uncontroverted evidence demonstrates that GameSpot's use of the Photo had absolutely no negative effect on the market for it." (Def. Br. (Dkt. No. 30) at 17) Defendant further contends that there is no evidence that Defendant "'deprived [Plaintiff] of the opportunity to exploit the value of his copyright during its peak demand.'" (Def. Reply (Dkt. No. 38) at 6 (quoting Pltf. Opp. (Dkt. No. 43) at 23)) As to all of the photographs, Defendant argues that Plaintiff's claim of market harm is "belied by Mr. Ferdman's own testimony that there has been no harm to his market. To the contrary, after GameSpot's posting, Mr. Ferdman has sold 'hundreds' of licenses, and he continues to 'expect these photos to sell for the rest of [his] life.'" (Def. Opp. (Dkt. No. 35) at 10 (quoting Ferdman Dep. (Dkt. No. 32-1) at 25-26; citing Def. R. 56.1 Stmt. (Dkt. No. 31) ¶¶ 41-42))

34

Plaintiff argues, however, that "because Defendant's use constituted a mere duplication of Ferdman's original photographs, the Court may presume market harm." (Pltf. Br. (Dkt. No. 25) at 24) Plaintiff further contends that "Defendant's use impairs the actual market for [his] photographs[,] because the Defendant's article[s] serve[] the very same purpose as those articles in which the photographs appear legitimately." (Id.) Finally, Plaintiff argues that widespread conduct of the sort Defendant engaged in would have an adverse impact on his potential for licensing the photographs. (Id. at 25)

In Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417 (1984), the Supreme Court stated that

> although every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright, noncommercial uses are a different matter. A challenge to a noncommercial use of a copyrighted work requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work. Actual present harm need not be shown; such a requirement would leave the copyright holder with no defense against predictable damage. Nor is it necessary to show with certainty that future harm will result. What is necessary is a showing by a preponderance of the evidence that some meaningful likelihood of future harm exists. If the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated.

Id. at 451 (emphasis in original).

In Campbell, the Court clarified that this presumption of market harm only applies where the use of the work is not transformative. Campbell, 510 U.S. at 591 ("No 'presumption' or inference of market harm that might find support in Sony is applicable to a case involving something beyond mere duplication for commercial purposes.").

For the Gallery Photographs, then, there is a presumption of market harm – Defendant's use of these photographs were not transformative. As to the Holland Photograph, however, the presumption of market is also applicable – it is a commercial use that is a

"duplication of the entirety of an original" that serves as a substitute for the photograph. Id.; see Cariou v. Prince, 714 F.3d 694, 708 (2d Cir. 2013) ("We have made clear that 'our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work.'" (quoting Blanch v. Koons, 467 F.3d 244, 258 (2d Cir. 2006) (quotation marks omitted) (emphasis added))); N. Jersey Media Grp., 74 F. Supp. 3d 605 (fourth factor weighed against fair use where image was not "substantially transformative" of the copyrighted photograph).

Defendant's argument that its articles did not have a discernable effect on the market for Plaintiff's photographs misses the mark. The market effect factor "'focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original.'" Fox News Network, 883 F.3d at 179 (quoting Authors Guild, 804 F.3d at 223). Moreover, this factor requires consideration of "'not only the . . . market harm caused by the particular actions of the alleged infringer,' but also the market harm that would result from 'unrestricted and widespread conduct of the [same] sort.'" Id. (quoting Campbell, 510 U.S. at 590).

Here, Plaintiff testified that he was "not aware" of any sales or licensing opportunities that he lost because of Defendant's use of his photographs. (Ferdman Dep. (Dkt. No. 32-1) at 12-13) Other than the license fee that Defendant did not pay for using his photographs, Plaintiff is not aware of any other damage that he suffered. (Id. at 13-14) Plaintiff further testified that there were "hundreds" of licenses issued for the photographs since the Complaint in this action was filed (id. at 25-26), and that the market for the photographs was the

36

strongest when "the film came out," and will be strong again if "there is a sequel that comes out." (Id. at 27)

Defendant argues that this testimony "conclusively demonstrates the absence of market harm." (Def. Br. (Dkt. No. 30) at 18) The Court disagrees. Defendant's use of the photographs in its articles is a clear substitute for the market use of Plaintiff's photographs. Indeed, Defendant's use is "'paradigmatic of the only market the photographs could reasonably have: licensing to media outfits.'" N. Jersey Media Grp., 74 F. Supp. 3d at 623 (quoting Fitzgerald v. CBS Broad., Inc., 491 F. Supp. 2d 177, 189 (D. Mass. 2007)). Moreover, the licensing of photographs to media outlets is a "traditional, reasonable, [and] likely to be developed market" of the sort courts consider in assessing this factor, Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 614 (2d Cir. 2006) (quoting Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 930 (2d Cir. 1994)), and Plaintiff's unrebutted testimony shows that there is a continuing market for the photographs at issue.

## 5. Balancing of the Four Fair Use Factors

Having considered all four fair use factors "in light of the purposes of copyright," Campbell, 510 U.S. at 578, the Court concludes – as to the Gallery photographs – that Defendant's use of these photographs is a wholly untransformative and unaltered copy of Plaintiff's photographs, and that Defendant's use of these photographs is a perfect substitute for the intended market. In these circumstances, fair use is unavailable as a matter of law. See BWP Media, 196 F. Supp. 3d at 407 ("The Court has found no case . . . in which the use of an image solely to present the content of that image, in a commercial capacity, was found to be fair.").

As to the Holland Photograph, however, the fair use issue cannot be resolved as a matter of law. As discussed above, reasonable jurors could disagree about whether the use was transformative. Unlike the Gallery Photographs, the Holland Photograph was arguably

newsworthy because Holland himself had posted the picture and commented on it. Even so, the Holland Article – like the Gallery Article – reported on the Holland Photograph as one of the "images . . . from the set [that has] steadily emerged." (Holland Article (Dkt. No. 33-1) at 2)

Given this record, the cross-motions for summary judgment on the fair use issue as to the Holland Photograph will be denied. See N. Jersey Media Grp., 74 F. Supp. 3d at 623 ("Weighing the results together, in light of the purposes of copyright, the Court cannot conclude as a matter of law that Defendants' use of the Work was fair. Material questions of fact exist concerning the purpose of the Combined Image's use, precluding a determination of the first statutory factor. The second factor weighs in favor of fair use, but that factor is only rarely determinative and is not so in this case. The third factor is neutral. The fourth and most important factor weighs against fair use. Accordingly, Defendants' motion for summary judgment must be denied."); Sarl Louis Feraud, 627 F. Supp. 2d at 131 ("The inquiry into the 'character and purpose' of the alleged infringer's use is fact-intensive, and requires a subtle balancing of several sub-factors, each of which in turn involves the resolution of disputed facts. Depending on how those disputes were resolved, a reasonable fact-finder could find that [Defendant's] use of plaintiffs' designs is transformative, that its use did not amount to commercial exploitation, and that [Defendant] did not act in bad faith. Moreover, even if not all of these considerations were found to favor the defendant, the appropriate balance of the considerations is itself a factual question that is not, on this record, appropriately made on summary judgment."); id. at 136 ("Taking the factors together, it cannot be said as a matter of law that no reasonable fact-finder could conclude that the fair use factors weigh in favor of [Defendant's] use.").

## IV.  WILLFULNESS

Under 17 U.S.C. § 504(c)(1), a copyright owner may elect to recover statutory damages between $750 and $30,000 "as the court considers just." Under Section 504(c)(2), where "infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005).

Defendant argues that Plaintiff "has come forward with no evidence that GameSpot harbored any doubts about its right to make the challenged uses," and thus that he has "presented no genuine issue to prevent entry of judgment against him foreclosing any award of enhanced statutory damages for willful infringement." (Def. Br. (Dkt. No. 30) at 20)  Plaintiff argues that "[a] jury is in the best position to determine, based on the record, whether Defendant's activities were consistent with willfulness.  Certainly, Ferdman has shown enough on the record to indicate that it is a genuine issue of material fact in dispute." (Pltf. Opp. (Dkt. No. 43) at 24-25)  Plaintiff's opposition brief does not point to what that evidence is, however. (See id.)

While "'[g]enerally speaking, summary judgment is not a tool well suited to determining willfulness,'" Young-Wolff v. John Wiley & Sons, Inc., 12 Civ. 5230 (JPO), 2016 WL 154115, at *10 (S.D.N.Y. Jan. 12, 2016) (quoting Close-Up Int'l, Inc. v. Berov, 382 F. App'x 113, 117 (2d Cir. 2010)), "'[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion,'" Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d

134, 141 (2d Cir. 1991) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)); see also Lipton v. Nature Co., 71 F.3d 464, 472 (2d Cir. 1995) ("Although courts are generally reluctant to dispose of a case on summary judgment when mental state is at issue, it is permissible to do so where there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment.").

Here, Plaintiff has submitted no evidence that Defendant used Plaintiff's photographs with knowledge of Plaintiff's copyright or with reckless disregard or willful blindness as to his rights. As to the photographs in the Gallery Article, Plaintiff does not contest that "GameSpot obtained the photos . . . from a Twitter account believed by GameSpot to be circulating studio publicity shots." (Pltf. R. 56.1 Counterstmt. (Dkt. No. 45-1) ¶ 34) As to the Holland Photograph, Plaintiff admits that the Holland Article "included a copy of the photo that Holland posted to his Instagram page." (Id. ¶ 27) In sum, there is no evidence that Defendant was either aware of the infringing activity or that it showed reckless disregard or willful blindness to Plaintiff's rights. Because Plaintiff has presented no evidence of willful infringement, Defendant's motion for summary judgment on this issue will be granted.

## V.    AFFIRMATIVE DEFENSES

Plaintiff has moved for summary judgment on Defendant's affirmative defenses of failure to state a claim and license. (Pltf. Br. (Dkt. No. 25) at 27-28) Defendant has not responded to Plaintiff's arguments concerning these defenses, and there is no evidence in the record suggesting that Defendant obtained a license to use the photographs at issue. The Court concludes that Defendant has abandoned these defenses. See Di Giovanna v. Beth Israel Med. Ctr., 651 F. Supp. 2d 193, 208 (S.D.N.Y. 2009) (where plaintiff "made no attempt to rebut defendants' motion for summary judgment" on his retaliation claim under the Family and Medical Leave Act, district court ruled that he had abandoned the claim); id. at 208 n.108

40

(collecting cases); see also Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996) ("[L]itigants should be on notice from the very publication of Rule 56(e) that a party faced with a summary judgment motion 'may not rest upon the mere allegations or denials' of the party's pleading and that if the party does not respond properly, 'summary judgment, if appropriate, shall be entered' against him." (quoting Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988))).

Accordingly, Plaintiff's motion for summary judgment as to these affirmative defenses will be granted.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted as to the issue of willful infringement. Plaintiff's motion for summary judgment on (1) Defendant's fair use defense as to the Gallery Photographs; and (2) Defendant's affirmative defenses of failure to state a claim and license is granted. The cross-motions are otherwise denied. The Clerk of Court is directed to terminate the motions. (Dkt. Nos. 24, 29, 39, 45)

This case will proceed to trial on **November 5, 2018 at 9:30 a.m.** in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York. The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order, motions in limine, voir dire requests, and requests to charge are due on **October 8, 2018**. Responsive papers, if any, are due on **October 15, 2018**. There shall be a pretrial conference on **November 2, 2018 at 12:30 p.m.**

Dated: New York, New York
September 21, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge

41